# Case No. 1,516.

## BLANCHARD v. SPRAGUE.

### [1 Cliff. 288.]¹

Circuit Court, D. Massachusetts. June Term, 1859.

PATENTS — LICENSE — WHAT CONSTITUTES— ADDITIONAL LICENSE FEE — REMEDY AT LAW — ENJOINING LICENSEE—EQUITY JURISDICTION—WITNESSES—COMPETENCY OF PARTIES.

1. Parties to a suit in equity are not competent witnesses in their own behalf, under the

¹ [Reported by William Henry Clifford, Esq., and here reprinted by permission.]

existing legislation of congress, in the circuit court.

[See Ferson v. Sanger, Case No. 4,752. Contra, Rison v. Cribbs, Id. 11,860.]

2. When a patentee knowingly and for a considerable length of time acquiesced in the use of his patented machine by another, who had previously constructed and used the same by his permission, and actually and voluntarily accepted a compensation for such use from the person in possession, as just payment for such use, those acts of the patentee were *held* to be evidence from which a license may be inferred, unless controlled by other facts and circumstances.

[Cited in Herman v. Herman, 29 Fed. 94; American Paper-Bag Co. v. Van Nortwick, 3 C. C. A. 274, 52 Fed. 757.]

[See Cressler v. Custer, Case No. 3,388.]

3. And where, as in this case, the only reservation made when the payment was received, was the right on the part of the patentee to claim an additional sum for such use of the machine, it cannot be *held* that the acts of the respondent in using the machine under such circumstances, prior to the time when such payment was made, were unlawful.

4. Where a party in accepting a certain rate of tariff on articles manufactured by his patented machine, reserved the right to claim a certain additional tariff on such articles, and claimed that by reason of such reservation he was entitled to receive such additional tariff as compensation for the use of his machine, *held*, the claim furnished no ground for an injunction, presupposing, as it did, that the use of the machine was not unlawful, but presented a case on which the complainant had an adequate remedy at law.

[Cited in Dowell v. Griswold, Case No. 4,041; Hartell v. Tilghman, 99 U. S. 554; White v. Lee, 3 Fed. 224; Teas v. Albright, 13 Fed. 413.]

5. Wherever a contract is made in relation to patent rights, which is not provided for and regulated by an act of congress, the parties, in case of dispute, stand upon the same ground as other litigants in respect to the jurisdiction of the court.

[Cited in Dowell v. Griswold, Case No. 4,041; Teas v. Albright, 13 Fed. 413; Albright v. Teas, 106 U. S. 620, 1 Sup. Ct. 556.]

[See Goodyear v. Union India Rubber Co., Case No. 5,586; Bloomer v. Gilpin, Id. 1,558; Merserole v. Union Paper Collar Co., Id. 9,488.]

This was a bill in equity brought by [Thomas] Blanchard, who was a citizen of Massachusetts, against [Chandler] Sprague, who was a citizen of the same state. The bill charged the respondent with the infringement of certain patent rights owned by the complainant, and prayed for an account and for an injunction. The pleadings and testimony disclosed the following facts: January 20th, 1820, letters-patent were issued to Blanchard for a machine for cutting irregular forms, such as shoe-lasts and boot-trees. Various acts of congress were passed extending the patent, by the last of which it was renewed for fourteen years, from January 20, 1848. Prior to the year 1851 the respondent, with the permission of the complainant, constructed one of his machines, and used it in the manufacture of shoe-lasts and boot-trees under a written license for one

year, renewable yearly, at a tariff of one and one half cents for each article manufactured, payable quarterly. Renewals had been omitted some years, but the tariff had been regularly paid and received without objection. The license contained a provision that the complainant might raise the tariff from one and one half cents to two cents, upon giving six months' notice. July 15th, 1857, the complainant notified the respondent of his intention to restrain him from using the machine, unless he should, on or before January 20th, 1858, obtain a new license from the complainant, in which the rate of tariff should be two cents instead of one and one half. Nevertheless the respondent continued to use the machine up to the time of the filing of the bill and afterwards, and the complainant voluntarily received from him the tariff of one and one half cents at the end of each quarter up to April 1st, fifteen days after the bill was filed. The tariff for the last quarter was received after a tender of it had been once refused, with the proviso expressed in the receipt given for the same, that it was received without thereby waiving the right, if any he had, to recover one half cent more for each last turned. Much testimony was introduced tending to show that the complainant had waived his right to increase the tariff; but from the view of the case taken by the court, it is not necessary to reproduce it here. The depositions of the complainant and of the respondent were both taken to be used as evidence in the case. Counsel for respondent objected to the deposition of the complainant, on the ground that he was interested in the event of the suit. After argument, the parties agreed that, if this objection were sustained by the court, the deposition of the respondent should also be considered as having been objected to.

Lemuel Shaw, Jr., and Sidney Bartlett, for complainant.

J. P. Healey and B. R. Curtis, for respondent.

CLIFFORD, Circuit Justice. By the general rules of law, the parties to a suit, being interested in the event, are not competent to testify in their own favor, and there is no law of congress relieving them from that disability. In trials at common law, the laws of the states, except where the constitution, treaties, or statutes of the United States otherwise require or provide, furnish the rules of decision in the federal courts in cases where they apply. It is expressly so provided in the thirty-fourth section of the judiciary act [1 Stat. 92], and it has been so held by the supreme court on so many different occasions, that the point cannot now be regarded as open to dispute. McNiel v. Holbrook, 12 Pet. [37 U. S.] 89; Wayman v. Southard, 10 Wheat. [23 U. S.] 1; McKeen v. Delancy, 5 Cranch [9 U. S.] 31; Polk's Lessee v. Wendal, 9 Cranch [13 U. S.] 98;

Thatcher v. Powell, 6 Wheat. [19 U. S.] 127; McCluny v. Silliman, 3 Pet. [28 U. S.] 277. Beyond question, therefore, state laws furnish the rules of evidence in the federal tribunals in civil cases at common law, subject to the exception specified in the judiciary act. Parties are made competent witnesses in civil suits by the laws of Massachusetts, and consequently they are so, subject to the exceptions before mentioned, in the federal courts holden in that district in trials at common law. But the chancery jurisdiction, practice and rules of evidence in the circuit courts of the United States are the same in all the states, and no state statute upon the subject has been adopted by any law of congress, unless that construction be given to the provision of the judiciary act already recited. Suits in equity are plainly distinguished from trials at common law in the constitution, and they are so distinguished in a very pointed manner in repeated instances in the judiciary act. They are so, in the first place, in the eleventh section of the act which describes and defines the jurisdiction of the circuit courts. By the language of the section, jurisdiction is conferred upon the circuit courts in suits in equity as something in addition to suits of a civil nature at common law. So also, in the twenty-second section, it is provided that judgments and decrees in civil actions and suits in equity may in certain cases be re-examined and reversed or affirmed in the supreme court. Actions at common law are also pointedly distinguished from causes in equity and of admiralty and maritime jurisdiction by the thirtieth section of the same act, and from its whole tenor I am satisfied that the thirty-fourth section of the act does not control the question under consideration. It was held by the supreme court in U. S. v. Reid, 12 How. [53 U. S.] 363, that the language of this section cannot, upon any fair construction, be extended beyond civil cases at common law as contradistinguished from suits in equity, and in that opinion I entirely concur. Judge Story held in Boyle v. Zacharie, 6 Pet. [31 U. S.] 658, that the chancery jurisdiction given by the constitution and laws of the United States is the same in all the states of the Union, and that the rules of decision are the same in all. That principle was not a new one when it was thus announced, for it had previously been held by the same court in U. S. v. Howland, 4 Wheat. [17 U. S.] 115, that as the courts of the Union have a chancery jurisdiction in every state, and the judiciary act confers the same chancery powers on all and gives the same rule of decision, its jurisdiction in Massachusetts must be the same as in the other states; and that principle was subsequently reaffirmed in Neves v. Scott, 13 How. [54 U. S.] 272, and appears to be the settled law of the supreme court. For these reasons I am of the opinion that the parties to a suit in equity under the existing legislation of congress, are not competent witnesses, and the depositions both of the complainant and respondent are accordingly suppressed.

Having disposed of this preliminary question, I will now proceed to consider the case upon its merits. Under the admissions of the respondent, as contained in the answer, a prima facie case is made out for the complainant, so that the decision of the controversy must turn upon the matters set up in defence. As alleged in the answer, and not controverted by the complainant, the case shows that, for several years prior to the 1st of December, 1851, the respondent had been using, by the permission of the complainant, one of the patented machines, at North Bridgewater, in the state of Massachusetts. That machine was constructed under his own superintendence, and at his own expense, and he had used it under an agreement, or understanding, with the complainant, that he should pay therefor a tariff of one and one half cents for each and every shoe-last or boot-tree turned by him with the same. Under that arrangement, the tariff of one and one half cents for each last and boot-tree manufactured was to be paid quarter-yearly, at the end of each quarter; and it is not controverted that those payments were regularly and constantly made, pursuant to the terms and conditions of the agreement. Similar arrangements had also been made by the complainant with six other persons, each of whom had constructed a machine, and had respectively been using it for several years prior to the period before mentioned, paying therefor the same tariff to the complainant. Those agreements were made in the first instance to continue for one year, with the stipulation for a renewal of the same by the complainant from year to year for the period of seven years, provided the licensee had not, in the mean time, committed any breach of the terms and conditions, but with the right, on the part of the complainant, upon giving six months' notice of his intention, to increase the tariff to a rate not exceeding two cents for each last and boot-tree, if, in his opinion, the interest of the patent should require it. Some of those licenses were granted as early as the fall of 1847, and others bear date as late as the 20th of January, 1848. They are all substantially alike, and in most instances the stipulation for renewal was enlarged either by an indorsement on the agreement, or by a separate instrument, and extended to the term of fourteen years from the time the agreement commenced to operate. On the 5th of June, 1851, the complainant, under a certain contract in writing, sold to James M. Quimby the exclusive right and privilege of making, using, and vending his machines for certain purposes therein specified, in all the states and territories of the United States, excepting the right to make lasts and boot-trees in the New England states. Shoe-lasts and boot-trees manufactured by machines, patent

ed in this country, were at that time, it seems, imported here from the British provinces, so that it became desirable, in the vew of the complainant and others interested in his patent, to procure, if possible, the passage of a law by congress prohibiting such importation. Accordingly, he solicited contributions from his licensees in this state to defray the expenses in making the application to congress for the passage of such a law. Upon that ground, and with that view, he applied to the respondent, and the other licensees similarly situated, for such contributions, and in consideration thereof agreed with him and them, if they would pay over to James M. Quimby the sum of eight hundred dollars, towards defraying the expenses of such an application; that whenever such a law was passed and approved, he would not, during the continuance of his patent, increase the number of licenses to manufacture lasts within the territory of New England, east of the Connecticut river. That agreement, however, was made upon the further condition that those then having such licenses should supply all the lasts wanted in the territory therein described. Pursuant to that agreement, the respondent subscribed one hundred dollars, and the remaining six persons or firms, subscribed seven hundred dollars; but no such law was ever passed by congress, and of course the promisors did not become liable, under their subscriptions, to pay the respective sums by them subscribed. Afterwards, towards the close of the following year, the terms of this agreement were modified, or rather a new one was made in its stead, which was not reduced to writing. During the interval that elapsed, the licensees, before named, continued to use their respective machines in the manufacture of lasts and boot-trees in the territory embraced in their district, paying therefor, as they had done before, a tariff of three cents a pair, or one and one half cents for each and every piece of last or boot-tree by them manufactured. Efforts were made, in the mean time, to procure the passage of a law by congress, such as is described in the original agreement, but without success. Towards the close of the year 1852, a second application for money to prosecute the undertaking was made by one of the agents who had that subject in charge. He applied, in the first place, to the complainant, and was by him referred to the licensees for the manufacture of lasts and boot-trees, affirming that it was for their interests to contribute, for the reason that he was going to allow them to run their respective machines during the continuance of the patent, without charging them more than three cents a pair for the articles by them manufactured. They declined to contribute until the proposed law should be enacted, without satisfactory assurance, from the complainant, that they should receive something of value for their money. At the request of the agent, several of the licensees accompanied him to the dwelling-house of the complainant, and there had an interview with the latter in the presence of that agent. That interview resulted in a new agreement, or a modification of the one previously made, in writing, and is to the effect, as proved by the witnesses, that the licensees should pay the eight hundred dollars towards defraying the expenses of procuring the passage of the proposed law; and that the complainant, in consideration thereof, should not charge them but three cents a pair for the lasts and boot-trees by them manufactured, whether the bill passed or not. Such of the licensees as were not present on the occasion were duly notified of the arrangement by their associates, and they approved and ratified it, and the whole amount of the subscription was subsequently paid, pursuant to the agreement. All of these facts are substantially and satisfactorily proved by two or three witnesses, and they accord in substance and effect with the allegations of the answer. Half or more of the amount specified was paid about the time the last agreement was made, and the remainder of the eight hundred dollars was paid as it was wanted for the purpose for which it had originally been subscribed. Attempts were made to discredit the statements of the witnesses called to substantiate these facts, but so clearly without success that any further analysis of the testimony is deemed unnecessary. After that interview, the licensees went on using their respective machines without interruption or complaint, paying therefor the tariff of one and one half cents for each and every last and boot-tree by them turned, as they had done from the commencement, and continued so to do until the 15th of July, 1857. On that day, the complainant notified the respondent of his intention to restrain him from using the machine, unless he should obtain a new license from the complainant, on or before the 20th of January, 1858, in which the rate of the tariff to be paid should be two cents, instead of one and one half cents, for each and every last and boot-tree by him manufactured. Similar notices were also given by the complainant about the same time to the other licensees. But they have all continued to use their respective machines up to the present time, and the complainant has voluntarily received from each of them the tariff of one and one half cents for each and every last and boot-tree by them manufactured, at the end of each quarter, up to the 1st of April, 1858, and in some instances to a later period. Evidence was also introduced by the respondent, showing that the complainant has, in repeated instances, acknowledged since those notices were given that these licensees had the right to run their respective machines, by paying that rate of tariff within the territory of their district, claiming only, that if they did not do so, and did not supply the market, he had a right to license

others to manufacture the same articles. Tender of the amount of the tariff, due for the quarter ending the 1st of April, 1858, was duly made by the respondent to the complainant on the day it became payable. At that time, it was refused by the complainant; but on the 19th of the same month, he wrote to the respondent, informing him that his tender would be received and receipted for, at one and one half cents for each last, not however waiving the right, if any he otherwise had, to an additional half-cent for all lasts turned after the 20th of January, 1858, if the court should sustain the validity of that claim. Payment was accordingly made of the amount previously tendered on the 24th of April, 1858, as alleged in the answer, and the complainant gave a receipt to the respondent for the same, acknowledging in the receipt that the sum so paid, amounting in the whole to one hundred and sixteen dollars and thirty-five cents, was one and one half cents for every last turned by the respondent with the machine in question for the quarter ending the 1st of April, 1858, but repeating substantially the reservation made in his letter, signifying his willingness to accept the tender. Another fact of considerable importance in this investigation ought not to be overlooked in this statement. All of these licensees got up their own machines, and severally constructed them at their own expense, by the permission of the respondent. To that extent the agreement is executed, and the answer, testimony, and exhibits clearly show that it was fully executed for every purpose when the bill was filed, at least up to the 20th of January, 1858, which is nearly five years after the last agreement was made, under which the eight hundred dollars were finally paid. For every hour the machine was used by the respondent, within the period laid in the bill of complaint, and for fifteen days since the bill was filed, the complainant has received from the respondent the tariff of one and one half cents for each article manufactured by him with the machine, and all he now claims is that he is entitled to an additional half-cent for such of those articles as were turned by him subsequently to the 20th of January, 1858. Notwithstanding the allegations of the bill of complaint are so framed that they charge the respondent, as an infringer of the complainant's patent, it is apparent, from the whole case, that the real controversy between the parties arises solely out of the claim to recover the additional half-cent for each article manufactured, in the nature of rent, which the complainant insists is due to him for the use of the machine since the 20th of January, 1858. On this state of facts, I am of the opinion that the relief prayed for in the bill of complaint ought not to be granted in this suit, for the several reasons which will now be stated and briefly explained.

In the first place, the facts and circumstances clearly show that, for the whole period laid in the bill of complaint, the machine in question was used by the respondent under the license or permission of the complainant, which of itself is a complete answer to the prayer for relief. Suppose it be admitted, as is assumed by the complainant, that he had the right to revoke the license whenever the interests of the patent required it, and that his determination to do so was properly and seasonably made known at the time he gave the notice, it still appears, from his own acts, conduct, and declarations, that he acquiesced in the subsequent use of the machine by the respondent to the present time. Four witnesses testify in effect that the complainant admitted, after the notices were given, that these licensees had the right to run their respective machines during the continuance of his patent by paying the tariff of one and one half cents for the articles by them manufactured, declaring at the same time, however, that if they did not supply the market or turn all that were wanted, he should sell more rights. He also stated to those witnesses that he did not intend to make these licensees pay the additional rate, admitting, as before, that they had the right to run their respective machines, but said that they must make all the lasts that were wanted, or he should license others. As before remarked, he has received from this class of licensees the tariff of one and one half cents for every article turned to the time of filing the bill, and for fifteen days afterward, and all the reservation he made in his letter to the respondent, dated the 19th of April, 1858, was the right to claim an additional half-cent on such articles as were turned subsequently to the 26th of January in the same year. When a patentee knowingly, and for a considerable length of time, acquiesces in the use of his patented machine by another, who had previously constructed and used the same by his permission, and actually and voluntarily accepts a compensation for such use, from the person in possession of the machine as part payment for such use those acts of the patentee are evidence from which a license may be inferred, unless controlled by other facts and circumstances; and where, as in this case, the only reservation made, when the payment was received, was the right, on the part of the patentee, to claim an additional sum for such use of the machine, it cannot be held that the acts of the respondent, in using the machine under such circumstances prior to the time when such payment was made, were unlawful, and consequently an injunction under those circumstances will not be granted. Applying this principle to the case under consideration, it is obvious that the relief prayed for in the bill of complaint cannot be decreed on the facts disclosed in the testimony of the witnesses and the exhibits in this case, for the reason that the allegation in the bill,

that the acts of the respondent were unlawful, is not sustained.

Another reason may be given why relief cannot be granted in this case, which is equally decisive of the question, so far as respects the real matter in controversy between these parties. It is a suit, in point of fact, to recover an additional half-cent for the articles manufactured by the respondent within the reservation contained in the letter and receipt of the complainant before mentioned. No dispute arises in the case under any act of congress, nor does the decision depend in any respect upon the construction of any law of congress in relation to patents. On the contrary, it arises entirely out of the agreement, express or implied, for a license, and the rights of the parties depend altogether upon the ordinary rules of law, and the general principles which regulate and control the decision of the court in equity suits. What the complainant really claims is that he terminated or revoked the license under the agreement which previously existed between the parties by giving the notice, and that the respondent subsequently continued to use the machine without any stipulation as to the rate of tariff. In accordance with this theory, he assumes that, in accepting the one and one half cents from that date to the filing of the bill, he reserved the right to claim and recover an additional half-cent for all such articles as were manufactured by the respondent within that period, and that by virtue of that reservation he is entitled to recover that amount in addition to what he has received as a reasonable compensation for the use of the machine. Looking at the claim from that point of view, and it is the one in which it is presented by the evidence, it furnishes no ground whatever for an injunction, for the reason that it presupposes that the use of the machine was not unlawful, and presents a case, on the facts disclosed, for which the complainant has a plain and adequate remedy at law. But suppose it were otherwise, and that his remedy in equity would be more effectual, and that it was a fit case for equity cognizance, it would not benefit the complainant in this suit, for the reason that it does not depend in any degree whatever upon any act of congress respecting patent rights. Whenever a contract is made in relation to patent rights which is not provided for and regulated by an act of congress, the parties, if any dispute arises, stand upon the same ground as other litigants in respect to the jurisdiction of the court. Wilson v. Sandford, 10 How. [51 U. S.] 100. Both these parties are citizens of the same State; and if the pleadings corresponded with the real nature of the controversy, it is clear beyond dispute that this court could have no jurisdiction of the case. Goodyear v. Day [Case No. 5,568]. Jurisdiction is not controlled, however, solely by the pleadings. But the case itself must be one within the cognizance of the court where the suit is brought. Where it appears at the trial that there is no question involved in the case which it is competent for the court to decide under the pleadings, the cause must be dismissed, notwithstanding the allegations of the bill may be sufficient to authorize the court to take cognizance of the suit. In this case it appears by the bill of complaint that both complainant and respondent were citizens of the state of Massachusetts at the time the bill was filed; and as there is no question involved in the controversy giving the court jurisdiction on account of the subject-matter of the suit, I am of the opinion that the relief prayed for in the bill of complaint cannot be granted. On both grounds, therefore, the bill must be dismissed.

[NOTE. For prior cases between the same parties involving this patent, see Blanchard v. Sprague, Cases Nos. 1,517 and 1,518; and, for other cases involving this patent, see note at end of Blanchard v. Reeves, Case No. 1,515.]